Exhibit
A

ASSET PURCHASE AGREEMENT

by and among

DREYER'S GRAND ICE CREAM, INC.

("Purchaser")

and

INTEGRATED BRANDS, INC.

and

ESKIMO PIE CORPORATION

("Sellers")

DATED

JANUARY 23, 2007

# TABLE OF CONTENTS

Page

ARTICLE I       DEFINITIONS...................................................................................1

1.1     "Accounts Payable" ...................................................................1
1.2     "Accounts Receivable" ..............................................................1
1.3     "Accounts Receivable Amount" ................................................1
1.4     "Affiliate" ..................................................................................1
1.5     "Allocation Schedule" ...............................................................2
1.6     "Ancillary Documents" ..............................................................2
1.7     "Assigned Contracts" .................................................................2
1.8     "Assigned Intellectual Property" ...............................................2
1.9     "Assigned Trademarks" ..............................................................2
1.10    "Assigned Trade Secrets" ..........................................................2
1.11    "Assumed Liabilities" ................................................................2
1.12    "Business Day" ..........................................................................2
1.13    "Business Records" ....................................................................2
1.14    "Closing"....................................................................................2
1.15    "Closing Date" ...........................................................................2
1.16    "Code"........................................................................................2
1.17    "Confidentiality Agreement" .....................................................2
1.18    "Co-Pack Agreement" ...............................................................2
1.19    "Defenses and Claims" ..............................................................2
1.20    "Encumbrances" ........................................................................2
1.21    "Estimated Accounts Receivable Amount" ...............................3
1.22    "Estimated Inventory Amount" ..................................................3
1.23    "Excluded Liabilities".................................................................3
1.24    "Formulations"...........................................................................3
1.25    "Governmental Entity" ..............................................................3
1.26    "Indemnitor" and "Indemnitee" .................................................3
1.27    "Indemnification Claim"............................................................3
1.28    "Intellectual Property" ...............................................................3
1.29    "Inventory" ................................................................................3
1.30    "Inventory Amount" ..................................................................3
1.31    "Losses" .....................................................................................4
1.32    "Negotiation Period"..................................................................4
1.33    "Paying Party" ...........................................................................4
1.34    "Permits"....................................................................................4
1.35    "Permitted Encumbrances"........................................................4
1.36    "Processing Instructions"...........................................................4
1.37    "Products" ..................................................................................4
1.38    "Purchase Orders"......................................................................4
1.39    "Purchase Price" ........................................................................4
1.40    "Purchased Assets".....................................................................4
1.41    "Purchaser Group" .....................................................................4
1.42    "Purchaser Indemnifiable Losses" .............................................4

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 1.43 | "Reimbursing Party" | 4 |
| 1.44 | "Seller Indemnifiable Losses" | 4 |
| 1.45 | "Seller Group" | 4 |
| 1.46 | "SKU" | 4 |
| 1.47 | "Solvent" | 4 |
| 1.48 | "Specifications" | 5 |
| 1.49 | "Tangible Assets" | 5 |
| 1.50 | "Tax" | 5 |
| 1.51 | "Tax Return" | 5 |
| 1.52 | "Third Party Claim" | 5 |
| 1.53 | "Trade Secrets" | 5 |
| 1.54 | "Trademarks" | 5 |
| 1.55 | "Transfer Taxes" | 5 |

| ARTICLE II | PURCHASE AND SALE OF PURCHASED ASSETS; ASSUMPTION OF LIABILITIES | 6 |
|---|---|---|
| 2.1 | Purchase and Sale | 6 |
| 2.2 | Purchased Assets | 6 |
| 2.3 | Assumption of Liabilities | 7 |
| 2.4 | Payment of Total Consideration | 8 |
| 2.5 | Tax Allocation | 9 |
| 2.6 | Taxes | 9 |
| 2.7 | Unassignable Assets | 10 |

| ARTICLE III | THE CLOSING | 10 |
|---|---|---|
| 3.1 | The Closing | 10 |
| 3.2 | Instruments of Transfer and Sale | 10 |
| 3.3 | Delivery | 10 |
| 3.4 | Purchase Price | 11 |
| 3.5 | Other Documents | 11 |

| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF SELLERS | 11 |
|---|---|---|
| 4.1 | Organization | 11 |
| 4.2 | Subsidiaries | 11 |
| 4.3 | Authorization | 11 |
| 4.4 | No Conflicts; Consents | 11 |
| 4.5 | Title to Purchased Assets | 12 |
| 4.6 | Litigation | 12 |
| 4.7 | Inventory | 13 |
| 4.8 | Intellectual Property | 13 |
| 4.9 | Financial Information | 15 |
| 4.10 | Accounts Receivable | 15 |
| 4.11 | Compliance with Laws and Regulations; Governmental Licenses, Etc | 15 |
| 4.12 | Warranty and Other Claims | 16 |

**TABLE OF CONTENTS**
(continued)

|  | | Page |
|---|---|---|
| 4.13 | Contracts | 16 |
| 4.14 | Customers and Distributors | 16 |
| 4.15 | Absence of Liabilities | 17 |
| 4.16 | Insurance | 17 |
| 4.17 | Brokers | 17 |
| 4.18 | Accuracy of Material Facts; Copies of Materials | 17 |
| 4.19 | Solvency | 17 |
| 4.20 | No Other Representations and Warranties | 17 |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 18 |
| 5.1 | Organization | 18 |
| 5.2 | Authorization | 18 |
| 5.3 | No Conflicts; Consents | 18 |
| 5.4 | Accuracy of Material Facts | 19 |
| 5.5 | Brokers | 19 |
| 5.6 | Solvency | 19 |
| ARTICLE VI | COVENANTS OF SELLERS | 19 |
| 6.1 | Regulatory Approvals | 19 |
| 6.2 | Consent of Third Parties | 19 |
| 6.3 | Discharge of Excluded Liabilities | 19 |
| 6.4 | Bulk Sales | 19 |
| ARTICLE VII | COVENANTS OF PURCHASER | 20 |
| 7.1 | Regulatory Approvals | 20 |
| 7.2 | Consent of Third Parties | 20 |
| 7.3 | Discharge of Assumed Liabilities | 20 |
| ARTICLE VIII | MUTUAL COVENANTS | 20 |
| 8.1 | Confidentiality | 20 |
| 8.2 | Publicity | 21 |
| 8.3 | Books and Records | 21 |
| ARTICLE IX | CLOSING DELIVERABLES | 21 |
| 9.1 | Closing Deliverables of Purchaser | 21 |
| 9.2 | Closing Deliverables of Sellers | 22 |
| ARTICLE X | POST-CLOSING MATTERS | 23 |
| 10.1 | Accounts Receivable | 23 |
| 10.2 | Further Assurances of Sellers | 23 |
| 10.3 | Further Assurances of Purchaser | 24 |
| 10.4 | Use of Intellectual Property | 24 |
| 10.5 | Sale of Retained Inventory | 25 |

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| ARTICLE XI | SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION | 25 |
| 11.1 | Survival of Representations and Warranties | 25 |
| 11.2 | Indemnification by Sellers | 25 |
| 11.3 | Escrow Fund | 26 |
| 11.4 | Indemnification by Purchaser | 27 |
| 11.5 | Procedures for Indemnification | 28 |
| 11.6 | Defense of Third Party Claims | 29 |
| 11.7 | Settlement of Third Party Claims | 29 |
| ARTICLE XII | GENERAL | 30 |
| 12.1 | Governing Law | 30 |
| 12.2 | Assignment; Binding upon Successors and Assigns | 30 |
| 12.3 | Severability | 30 |
| 12.4 | Entire Agreement | 30 |
| 12.5 | Counterparts | 31 |
| 12.6 | Expenses | 31 |
| 12.7 | Other Remedies | 31 |
| 12.8 | Amendment | 31 |
| 12.9 | Waiver | 31 |
| 12.10 | Notices | 31 |
| 12.11 | Construction and Interpretation of Agreement | 32 |
| 12.12 | No Joint Venture | 33 |
| 12.13 | Absence of Third Party Beneficiary Rights | 33 |
| 12.14 | WAIVER OF JURY TRIAL | 34 |

## EXHIBITS AND SCHEDULES

| Exhibit | Description |
|---------|-------------|
| A | Co-Pack Agreement |
| B | Escrow Agreement |
| C | Form of Opinion of General Counsel to Purchaser |
| D | Form of Opinion of Sellers' Counsel |

| Schedule | Description |
|----------|-------------|
| 1.1 | Accounts Payable |
| 1.2 | Accounts Receivable |
| 1.29 | Inventory |
| 1.37 | Products |
| 1.49 | Tangible Assets |
| 2.2(d) | Assigned Contracts |
| 2.2(e) | Registered Trademarks |
| 4.4 | Required Consents |
| 4.5 | Exceptions to Title |
| 4.6 | Litigation |
| 4.11 | Permits |
| 4.13(a) | Assigned Contracts |
| 4.14 | Major Customers and Distributors |
| 10.4 | SKUs for Products Subject to Real Fruit License |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into as of January 23, 2007 by and among Dreyer's Grand Ice Cream, Inc., a Delaware corporation ("Purchaser"), Integrated Brands, Inc., a New Jersey corporation ("Integrated Brands"), and Eskimo Pie Corporation, a Virginia corporation ("Eskimo Pie" and, together with Integrated Brands, "Sellers").

### RECITALS

WHEREAS, Sellers are engaged in, among other things, the business of manufacturing, marketing and selling "Eskimo Pie," "Chipwich" and "Real Fruit" trademarked products (the "Frozen Novelty Business") and the sale and distribution of soft serve ice cream and frozen yogurt products under the "Eskimo Pie," "Honey Hill" and "Northern Lights" trademarks (the "Foodservice Business" and, together with the Frozen Novelty Business," the "Business").

WHEREAS, Sellers desire to sell, transfer and assign to Purchaser and/or its designated Affiliates, and Purchaser and/or its designated Affiliates desire to purchase from Sellers, certain specific assets of Sellers relating to the Business, and the assumption of certain specific obligations and liabilities related to the Business, upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the representations, warranties and agreements herein contained, the parties agree as follows:

### ARTICLE I

### DEFINITIONS

As used in this Agreement, except as expressly provided or unless the context otherwise requires, the following terms shall have the meanings set forth or referenced below:

1.1    "Accounts Payable" shall mean those amounts owing by Sellers under Assigned Contracts or otherwise arising in connection with the Frozen Novelty Business and Foodservice Business (including but not limited to accrued purchase orders) listed on Schedule 1.1.

1.2    "Accounts Receivable" shall mean the accounts receivable, notes receivable of or amounts owing or payable to Sellers in connection with or relating to the Foodservice Business, including those set forth on Schedule 1.2.

1.3    "Accounts Receivable Amount" shall have the meaning set forth in Section 2.4(b) hereof.

1.4    "Affiliate" shall mean, with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with, such other Person at any time during the period for which the determination of affiliation is being made. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management

policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

1.5    "Allocation Schedule" shall have the meaning set forth in Section 2.5 hereof.

1.6    "Ancillary Documents" shall mean all documents or agreements required by this Agreement to be executed and delivered by any party hereto.

1.7    "Assigned Contracts" shall have the meaning set forth in Section 2.2(d) hereof.

1.8    "Assigned Intellectual Property" shall have the meaning set forth in Section 2.2(e)(iv) hereof.

1.9    "Assigned Trademarks" shall have the meaning set forth in Section 2.2(e)(i) hereof.

1.10    "Assigned Trade Secrets" shall have the meaning set forth in Section 2.2(e)(iii) hereof.

1.11    "Assumed Liabilities" shall have the meaning set forth in Section 2.3(a) hereof.

1.12    "Business Day" shall mean any day other than a Saturday, a Sunday or a day on which banks in New York are authorized or obligated by law or executive order to close.

1.13    "Business Records" shall mean any and all books, records, files, documentation, data, plans or information, in the Sellers' possession, that have been or now are used in or with respect to, in connection with or otherwise relating to the Purchased Assets and the Assumed Liabilities and the manufacture, sale and distribution of the Products.

1.14    "Closing" shall mean the closing of the sale of the Purchased Assets.

1.15    "Closing Date" shall mean the date of this Agreement or any other date specified and agreed to by Purchaser and Sellers.

1.16    "Code" shall mean the Internal Revenue Code of 1986, as amended.

1.17    "Confidentiality Agreement" shall mean the letter agreement, dated July 19, 2006, between Dreyer's Grand Ice Cream Holdings, Inc., the direct or indirect parent of Purchaser, and Coolbrands International, Inc. ("Coolbrands"), the direct or indirect parent of Sellers.

1.18    "Co-Pack Agreement" shall mean the agreement, to be entered into at the Closing, substantially in the form attached hereto as Exhibit A.

1.19    "Defenses and Claims" shall have the meaning set forth in Section 2.3(b) hereof.

1.20    "Encumbrances" shall mean restrictions, contractual or otherwise, on or conditions to transfer or assignment, claims, liabilities, liens, pledges, mortgages or security interests of any kind, whether accrued, absolute, contingent, or otherwise, affecting the Purchased Assets.

1.21    "Estimated Accounts Receivable Amount" shall have the meaning set forth in Section 2.4(b) hereof.

1.22    "Estimated Inventory Amount" shall have the meaning set forth in Section 2.4(c) hereof.

1.23    "Excluded Liabilities" shall have the meaning set forth in Section 2.3(c) hereof.

1.24    "Formulations" shall mean the current formulations for each Product.

1.25    "Governmental Entity" shall mean any federal, state, political subdivision or other governmental or regulatory agency or instrumentality, foreign or domestic.

1.26    "Indemnitor" and "Indemnitee" shall have the respective meanings set forth in Section 11.5(a) hereof.

1.27    "Indemnification Claim" shall have the meaning set forth in Section 11.5(b) hereof.

1.28    "Intellectual Property" shall mean:

(a)    patents, patent applications, patent rights, and inventions and discoveries and invention disclosures (whether or not patented);

(b)    trade names, trade dress, logos, packaging design, slogans, Internet domain names, registered and unregistered trademarks and service marks and related registrations and applications for registration, together with the goodwill, renewals and other rights associated therewith (collectively, "Trademarks");

(c)    copyrights in both published and unpublished works, including without limitation all compilations, databases and computer programs, manuals and other documentation and all copyright registrations and applications, and all derivatives, translations, adaptations and combinations of the above (collectively, "Copyrights");

(d)    know-how, trade secrets, confidential or proprietary information, recipes, research in progress, data, processes, formulae, strategies, techniques (collectively, "Trade Secrets");

(e)    franchises, licenses, permits, consents, approvals, and claims of infringement against third parties; and

(f)    Formulations, Specifications and Processing Instructions.

1.29    "Inventory" shall mean the inventory of the finished-goods Products, and raw materials and packaging inventory related to the Products, listed on Schedule 1.29 hereto.

1.30    "Inventory Amount" shall have the meaning set forth in Section 2.4(c) hereof.

1.31    "Losses" shall mean any and all loss, demand, action, cause of action, assessment, damage, liability, cost or expense, including without limitation, interest, penalties and reasonable attorneys' and other professional fees and expenses incurred in the investigation, prosecution, defense or settlement thereof, but excluding special, punitive or consequential damages related to any such loss, demand, action, cause of action, assessment, damage, liability, cost or expense, other than special, punitive or consequential damages actually awarded to a third party and paid or payable to such third party by a party hereto.

1.32    "Negotiation Period" shall have the meaning set forth in Section 11.5(d) hereof.

1.33    "Paying Party" shall have the meaning set forth in Section 2.6(a) hereof.

1.34    "Permits" shall mean permits, licenses, franchises, approvals and authorizations.

1.35    "Permitted Encumbrances" shall mean liens for current Taxes which are not past due, and liens described in any Schedule hereto which secure Assumed Liabilities.

1.36    "Processing Instructions" shall mean the current processing instructions for each Product.

1.37    "Products" shall mean the products of the Foodservice Business and the Frozen Novelty Business listed or described on Schedule 1.37 hereto, each a "Product."

1.38    "Purchase Orders" shall mean all purchase commitments and orders (subject to the terms and conditions of such commitments and orders) for finished-goods Products for which Products have not been shipped as of the Closing.

1.39    "Purchase Price" shall mean the sum of (i) Fourteen Million Nine Hundred Twenty-Five Thousand United States Dollars ($14,925,000.00), (ii) the Accounts Receivable Amount and (iii) the Inventory Amount.

1.40    "Purchased Assets" shall have the meaning set forth in Section 2.2 hereof.

1.41    "Purchaser Group" shall have the meaning set forth in Section 11.2(a) hereof.

1.42    "Purchaser Indemnifiable Losses" shall have the meaning set forth in Section 11.2(a) hereof.

1.43    "Reimbursing Party" shall have the meaning set forth in Section 2.6(a) hereof.

1.44    "Seller Indemnifiable Losses" shall have the meaning set forth in Section 11.4(a) hereof.

1.45    "Seller Group" shall have the meaning set forth in Section 11.4(a) hereof.

1.46    "SKU" shall mean the stock keeping number of a Product.

1.47    "Solvent" means, with respect to any person, that as of the date of the determination of (i) (a) the then fair saleable value of the property of such person is (y) greater

than the total amount of liabilities (including contingent liabilities but excluding amounts payable under intercompany promissory notes) of such person and (z) not less than the amount that will be required to pay the probable liabilities on such person's then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to such person; (b) such person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (c) such person does not intend to incur, or reasonably believe that it will incur, debts beyond its ability to pay such debts as they become due; and (ii) such person is "solvent" within the meaning given that term and similar terms under laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

1.48    "Specifications" shall mean the current raw materials, manufacturing, packaging, labeling and quality assurance specifications for each Product.

1.49    "Tangible Assets" shall mean all of the equipment, furniture and other tangible assets and properties listed on Schedule 1.49 hereto.

1.50    "Tax" or, collectively, "Taxes" means any and all federal, state and local taxes of any country, assessments and other governmental charges, duties, impositions and liabilities, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts and any obligations under any agreements or arrangements with any other person with respect to such amounts and including any liability for taxes of a predecessor entity.

1.51    "Tax Return" means any returns, declarations, reports, statements and any other document required to be filed in respect of any Tax.

1.52    "Third Party Claim" shall have the meaning set forth in Section 11.6 hereof.

1.53    "Trade Secrets" shall have the meaning assigned thereto in "Intellectual Property."

1.54    "Trademarks" shall have the meaning assigned thereto in "Intellectual Property."

1.55    "Transfer Taxes" shall mean all sales taxes, use taxes, conveyance taxes, transfer taxes, value-added taxes, filing fees, recording fees, reporting fees, fees for clearing customs, customs duties and other similar duties, taxes and fees, if any, imposed upon, or resulting from, the transfer of the Purchased Assets to Purchaser hereunder, except federal, state or local income or similar taxes based upon or measured by revenue, income, profit or gain from the transfer of the Purchased Assets or the operation of the Business prior to the Closing.

ARTICLE II

PURCHASE AND SALE OF PURCHASED ASSETS;
ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale.  Subject to and upon the terms and conditions of this
Agreement, effective as of the Closing, Sellers agree to sell, assign, transfer, convey and deliver
to Purchaser and/or its designated Affiliates, and Purchaser and/or its designated Affiliates agree
to purchase from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets.

2.2     Purchased Assets.  As used in this Agreement, the term "Purchased Assets"
means, collectively, all right, title and interest in, to and under the following assets, in each case
as such assets exist at the time of Closing:

        (a)     all Inventory;

        (b)     all Purchase Orders;

        (c)     all Accounts Receivable;

        (d)     all contracts and on-going business relationships with retailers, brokers,
private and public purchasers, and foodservice accounts pertaining to the Purchased Assets,
including without limitation the contracts, agreements and legally binding instruments listed on
Schedule 2.2(d) (the "Assigned Contracts");

        (e)     (i) (A) all Trademarks that are registered or have registrations pending set
forth on Schedule 2.2(e) and (B) subject to Section 10.4, all other unregistered Trademarks
pertaining solely to the Products (including "Eskimo Pie," "Chipwich," "Real Fruit," "Honey
Hill" and "Northern Lights"), and together with the remedies against infringements thereof and
rights to protections of interests therein under the laws of all jurisdictions associated therewith
(the "Assigned Trademarks"); (ii) all Formulations, Specifications and Processing Instructions;
(iii) Trade Secrets related exclusively to the Products (the "Assigned Trade Secrets"); and
(iv) Copyrights and Intellectual Property licenses exclusively related to the Products
(collectively, with the Assigned Trademarks, the Formulations, Specifications, Processing
Instructions, and the Assigned Trade Secrets, the "Assigned Intellectual Property");

        (f)     all existing product literature, advertising materials, marketing and
promotional materials, studies and reports and similar materials, to the extent such materials are
in the Sellers' possession, related to the Products; provided, however, that such materials shall
not include any materials subject to Sellers' right to maintain the attorney-client privilege; and
provided further that Sellers may retain copies of the foregoing to the extent that Sellers are
required by law to retain the same;

        (g)     a list of all entities who purchase Products as of the Closing Date
("Customers," each, a "Customer"), which also sets forth (i) sales by Customer and by SKU for
2006 and January 1, 2007 through the Closing Date, (ii) a price list as of the Closing Date for
each of the Products by Customers, (iii) a list of all suppliers of ingredients for the Products
specifying the type of ingredients each such supplier supplies, and prices at which such

ingredients are purchased from such suppliers; <u>provided</u> that Sellers shall provide such list to Purchaser, at the Closing, and shall also provide to Purchaser, at the Closing, a schedule of existing commitments to promotions agreed with Customers and all other similar commitments to Customers then in effect;

      (h)    all Tangible Assets;

      (i)    all Business Records;

      (j)    any other information that will enable Purchaser to effectively exploit the Products as may reasonably and legally be provided to Purchaser;

      (k)    all of Sellers' right, title and interest in the UPC codes for the Products;

      (l)    known retailer authorizations for the Products as of the Closing Date; and

      (m)    all Permits exclusively related to the Purchased Assets from any Governmental Entity that are transferable.

2.3   <u>Assumption of Liabilities</u>.

      (a)    Subject to and upon the terms and conditions of this Agreement, effective as of the Closing, Purchaser agrees to assume from Sellers and to pay, perform and discharge according to their terms all of the following liabilities and obligations of Sellers (the "<u>Assumed Liabilities</u>"):

      (i)    in accordance with Section 2.6 hereof, Purchaser's portion of all Transfer Taxes, and the portion of any real or personal property Taxes (or similar Taxes) relating to the Purchased Assets, whenever assessed, attributable to the period beginning immediately after the Closing, determined on a per diem basis;

      (ii)    all Accounts Payable; and

      (iii)    liabilities and obligations (including Taxes) related to the Purchased Assets arising from and after the Closing other than liabilities and obligations described in Section 2.3(c)(iii) hereof.

      (b)    Nothing herein shall be deemed to deprive Purchaser of any defenses, set-offs or counterclaims which Sellers may have had or which Purchaser shall have with respect to any of the Assumed Liabilities (the "<u>Defenses and Claims</u>"). Upon Purchaser's reasonable request, Sellers agree to assign, transfer and convey to Purchaser any Defenses and Claims and agree to cooperate with Purchaser to maintain, secure, perfect and enforce such Defenses and Claims, including the execution of any documents, the giving of any testimony or the taking of any such other action as is reasonably requested by Purchaser in connection with such Defenses and Claims. In the event Sellers fail to assign, transfer or convey any such Defenses and Claims, or fail to reasonably cooperate with Purchaser in maintaining, securing, perfecting and enforcing such Defenses and Claims, Sellers shall indemnify Purchaser against any losses or damages arising out of such failure.

(c)     Purchaser does not assume, and Sellers do not transfer or assign, any liabilities or obligations, whether or not related to the Business, and whether presently fixed and determined, contingent or otherwise, other than the Assumed Liabilities to be expressly assumed by Purchaser pursuant to Section 2.3(a) hereof and the liabilities of Purchaser under the Co-Pack Agreement. All such liabilities and obligations not expressly assumed by Purchaser ("Excluded Liabilities") shall remain liabilities of Sellers, which shall be solely liable to perform and discharge such liabilities and obligations. Excluded Liabilities shall include, without limitation, the following:

(i)     any liabilities or obligations related to any of the Purchased Assets or the operation of the Business prior to the Closing other than those liabilities and obligations described in Section 2.3(a) hereof and Taxes as set forth in Section 2.6 hereof;

(ii)     any liabilities or obligations with respect to Sellers' employees; and

(iii)     except for those products manufactured by Sellers under the Co-Pack Agreement on behalf of Purchaser pursuant to Purchaser's specifications, any liabilities or obligations for claims based on product liability related to any Products manufactured by or on behalf of Sellers.

2.4     Payment of Total Consideration.

(a)     In consideration for the purchase of the Purchased Assets, Purchaser shall pay to Sellers the Purchase Price and assume the Assumed Liabilities.

(b)     Sellers shall cause to be prepared and delivered to the Purchaser a statement (setting out in specific detail each of the items set forth therein) of the Accounts Receivable to be included in the Purchased Assets and the Accounts Payable to be included in the Assumed Liabilities. The Accounts Receivable amount set forth in the statement shall be the "Estimated Accounts Receivable Amount." Upon receipt of the statement, Purchaser shall be given reasonable access to all of Sellers' books and records relating to such statement. Prior to the Closing, Purchaser and Sellers shall agree on any adjustments, if any, to the Estimated Accounts Receivable Amount and the Accounts Payable amount set forth on the statement delivered by Sellers and shall agree to and approve a final statement of the amount of the Accounts Receivable to be included in the Purchase Price (the "Accounts Receivable Amount") and the amount of the Accounts Payable.

(c)     Sellers shall cause to be prepared and delivered to the Purchaser a statement (setting out in specific detail each of the items set forth therein) of the Inventory to be included in the Purchased Assets. The Inventory amount set forth in the statement shall be the "Estimated Inventory Amount." Upon receipt of the statement, Purchaser shall be given reasonable access to all of Sellers' books and records relating to such statement. Prior to the Closing, Purchaser and Sellers shall agree on any adjustments, if any, to the Estimated Inventory Amount set forth on the statement delivered by Sellers and shall agree to and approve a final statement of the amount of the Inventory to be included in the Purchase Price (the "Inventory Amount").

2.5    <u>Tax Allocation</u>. The Purchase Price and the Assumed Liabilities shall be allocated in their entirety among the Purchased Assets in accordance with Section 1060 of the Code. Purchaser shall prepare and deliver to the Sellers, for the Seller's review, an allocation schedule setting forth Purchaser's determination of the allocation of the Purchase Price (the "<u>Allocation Schedule</u>") within 120 days after the Closing Date, which shall be subject to the Sellers' reasonable and timely approval. If Sellers reasonably believe that the Allocation Schedule delivered by Purchaser cannot be supported, Purchaser and Sellers shall cooperate in good faith to resolve such dispute and modify the Allocation Schedule accordingly. Purchaser and Sellers agree to file all Tax Returns (including, without limitation, IRS Form 8594) consistent with the Allocation Schedule and further agree not to take any position inconsistent therewith for any Tax purpose.

2.6    <u>Taxes</u>.

(a)    Sellers and Purchaser shall each be responsible for fifty percent (50%) of any and all Transfer Taxes up to $100,000; thereafter, Purchaser shall be responsible for any and all Transfer Taxes in excess of $100,000. The party that is responsible under applicable law for preparing and filing a Transfer Tax Return (the "<u>Paying Party</u>") shall prepare and timely file such Tax Return, and shall timely remit amounts due under such Tax Return to the appropriate Tax authority. The Paying Party shall permit the other party (the "<u>Reimbursing Party</u>") to review and comment on the Transfer Tax Return prior to filing and shall make such changes as are reasonably requested by the Reimbursing Party. The Paying Party shall pay the Taxes shown on such Tax Return and the Reimbursing Party shall reimburse the Paying Party for its share of such Transfer Taxes by wire transfer of immediately available funds no later than five (5) days after receipt of written notice (or notice delivered by electronic communication) from the Paying Party that any such Transfer Tax has been paid to the applicable Governmental Entity. To the extent that the amount of Transfer Taxes is later determined as a result of an audit by a Tax authority or claim for refund to be different than the amount shown on any Tax Return then, if the amount determined to be due is greater, the Reimbursing Party shall promptly pay to the Paying Party, and if the amount determined to be due is less, the Paying Party shall promptly reimburse the Reimbursing Party, for its share of any such difference; <u>provided that</u> any refunds of such Transfer Taxes received by either party shall first be applied to the first $100,000 in Transfer Taxes paid by Sellers and Purchaser and thereafter to the Transfer Taxes in excess of $100,000 paid by Purchaser. The parties shall cooperate to the extent reasonably requested to minimize the imposition of Transfer Taxes, including but not limited to Purchaser providing a resale certificate with respect to the Inventory. After Sellers have paid in the aggregate $50,000 of Transfer Taxes, each Seller shall no longer be a Reimbursing Party for purposes of this Section 2.6(a).

(b)    With respect to any real or personal property Taxes (or other similar Taxes) relating to the Purchased Assets for which Tax Returns have been filed by Sellers prior to the Closing Date, and such Tax Returns cover a taxable period ending after the Closing Date (a "<u>Straddle Period</u>"), Purchaser shall pay Sellers at Closing the portion of any such Taxes shown to be due on such Tax Returns attributable to any Tax period (or portion thereof) beginning immediately after the Closing, determined on a per diem basis, and Sellers shall timely remit the full amount of such Taxes to the appropriate Tax authority. With respect to any real or personal property Taxes (or other similar Taxes) attributable to the Purchased Assets for which Tax

Returns have not been filed prior to the Closing Date, and such Tax Returns cover a Straddle Period, Purchaser shall prepare and timely file, and shall timely make all payments required with respect to, any such Tax Returns; provided, however, that Sellers will promptly reimburse Purchaser upon receipt of a copy of the filed Tax Return to the extent any payment made by Purchaser is attributable to any Tax period (or portion thereof) ending on or before the Closing Date, determined on a per diem basis. To the extent that the amount of any such real or personal property Taxes (or other similar Taxes) is later determined as a result of an audit by a Tax authority or claim for refund to be different than the amount shown on any such Tax Return, Purchaser shall promptly pay to Seller, or Seller shall promptly pay to Purchaser, as applicable, such party's respective share of any such difference. If the amount shown as payable on any Tax Return described in this Section 2.6(b) exceeds $10,000, Purchaser and Sellers shall each permit the other to review and comment on any such Tax Return prior to filing and shall make such changes to such Tax Return as are reasonably requested by the other party.

2.7     Unassignable Assets. Notwithstanding any provision of this Agreement or any of the Ancillary Documents, to the extent that any of the Purchased Assets are not assignable or otherwise transferable to Purchaser, or if such assignment or transfer would constitute a breach thereof or a violation of any applicable law, then neither this Agreement nor such Ancillary Documents shall constitute an assignment or transfer (or an attempted assignment or transfer) thereof until such consent, approval or waiver of such party or parties has been duly obtained. With respect to each such Purchased Asset, Sellers shall use their commercially reasonable efforts to obtain the consent, approval or waiver of any party to permit the assignment or transfer of Sellers' rights and obligations thereunder as promptly as practicable, but in any event prior to the Closing Date. Purchaser agrees to cooperate with Sellers and supply relevant information to such third party in order to assist Sellers in their obligations under this Section. Notwithstanding the foregoing, nothing contained herein shall obligate Sellers or Purchaser to expend or pay any amount to third parties to obtain any consents, approvals or waivers.

ARTICLE III

THE CLOSING

3.1     The Closing. The Closing shall take place at the offices of Ellenoff Grossman & Schole, LLP, 370 Lexington Avenue, New York, New York, or at such other location as Sellers and Purchaser may agree, at 1:00 p.m., New York City Time, on the Closing Date.

3.2     Instruments of Transfer and Sale. At the Closing, Sellers shall deliver to Purchaser and/or its designated Affiliates such bills of sale, endorsements, assignments and other good and sufficient instruments of transfer, conveyance and assignment, in form customary for such transactions and reasonably satisfactory to Purchaser's counsel, as shall be necessary to vest in Purchaser and/or its designated Affiliates good title to the Purchased Assets, free and clear of all Encumbrances, except Permitted Encumbrances.

3.3     Delivery. Sellers shall deliver the Inventory FOB to Purchaser at the facilities set forth on Schedule 1.29. After the Closing, liability for expenses related to packaging and moving such assets shall be borne by Purchaser.

3.4    Purchase Price. At the Closing, Purchaser and/or its designated Affiliates shall (i) deliver the sum of (A) $13,888,000, (B) the Accounts Receivable Amount and (C) the Inventory Amount to Sellers by wire transfer to the bank account or bank accounts per the wire instructions provided to Purchaser two (2) Business Days prior to the Closing Date; (ii) deliver the amount of $1,037,000 (the "Escrow Funds") to the escrow in accordance with the Escrow Agreement; and (iii) deliver instruments of assumption in form and substance reasonably satisfactory to Sellers and their counsel.

3.5    Other Documents. Each party shall deliver to the other at the Closing such other documents, certificates, schedules, agreements and instruments required by this Agreement to be delivered at such time.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Subject to and except for the information which is set forth on a list of exceptions, identified by the Section of this Article IV to which they pertain and contained in the Sellers Disclosure Schedule, Sellers hereby represent and warrant to Purchaser as of the Closing as follows:

4.1    Organization. Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and has the requisite corporate power to own, lease and operate its properties and to conduct its business as it is currently being conducted. Each Seller is duly qualified or licensed to do business as a foreign corporation in each jurisdiction in which the failure to be so qualified or licensed would have a material adverse effect on the Business or the Purchased Assets.

4.2    Subsidiaries. Sellers do not own any equity interest, directly or indirectly, in any corporation, partnership, limited liability company, joint venture, business, trust or other entity, whether or not incorporated, which is engaged in any aspect of the Business.

4.3    Authorization. This Agreement and all of the Ancillary Documents to which each Seller is or will be a party have been, or upon their execution and delivery hereunder will have been, duly and validly executed and delivered by such Seller and constitute, or will constitute, valid and binding agreements of such Seller, enforceable against such Seller in accordance with their respective terms. Each Seller has the requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Documents to which such Seller is or will be a party and, at the time of the Closing, will have the requisite corporate power and authority to carry out the transactions contemplated by this Agreement and the Ancillary Documents. The execution, delivery and performance by each Seller of this Agreement and the Ancillary Documents have been duly and validly approved and authorized by such Seller's Board of Directors. No approval of either Seller's stockholders or the stockholders of Coolbrands is required to effect the transactions contemplated by this Agreement or the Ancillary Documents.

4.4    No Conflicts; Consents. The execution and delivery by each Seller of this Agreement and the Ancillary Documents to which such Seller is or will be a party do not, and

the consummation of the transactions contemplated hereby and thereby and compliance by such Seller with the provisions hereof and thereof will not, contravene, conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under or violation of, or result in the creation of any charge or Encumbrance pursuant to, (i) any provision of the articles or certificate of incorporation or bylaws of such Seller, (ii) any judgment, order, decree, rule, law or regulation of any court or Governmental Entity applicable to such Seller or to any of the Products or Purchased Assets, or (iii) any provision of any agreement, instrument or understanding to which such Seller is a party or by which such Seller is bound or any of the Products or Purchased Assets are affected, nor will such actions give to any other person or entity any interests or rights of any kind, including rights of termination, acceleration or cancellation, in or with respect to any of the Purchased Assets, or result in the creation of any Encumbrance on any of the Purchased Assets. Except as set forth on <u>Schedule 4.4</u>, no consent, approval, order or authorization of, or registration, declaration or filing with, any third party or any Governmental Entity is required to be obtained on the part of Sellers to permit the consummation of the transactions contemplated by this Agreement or the Ancillary Documents, except for such consents, authorizations, filings, approvals and registrations which, if not obtained or made, would not prevent or materially alter or delay any of the transactions contemplated by this Agreement or be reasonably likely to have a material adverse effect on Sellers. All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, any third party or any Governmental Entity referenced on <u>Schedule 4.4</u> shall have been obtained on or prior to the Closing.

    4.5   <u>Title to Purchased Assets</u>. Except as set forth in <u>Schedule 4.5</u>, Sellers have, or as of the Closing will have, good and marketable title to all of the Purchased Assets. No financing statement under the Uniform Commercial Code with respect to any of the Purchased Assets is active in any jurisdiction, and neither Seller has signed any such active financing statement or any security agreement authorizing any secured party thereunder to file any such financing statement against any of the Purchased Assets. Except for the Assigned Intellectual Property, there is no intangible property of Sellers or their Affiliates relating to the manufacturing, packaging and distribution of the Products. The UPC codes and Tangible Assets are being sold "as is" and Purchaser acknowledges and agrees that, except as expressly set forth herein, Sellers make no express or implied representations or warranties as to the availability for use of the UPC codes or the condition or suitability for use of the Tangible Assets. Notwithstanding the foregoing, there does not now exist and should not at the Closing Date exist any condition which interferes with the use of the Tangible Assets in the manner used by Sellers prior to the Closing Date. Except as set forth in <u>Schedule 4.5</u>, at the Closing, Sellers will sell, convey, assign, transfer and deliver to Purchaser good, valid and marketable title and all the Sellers' right and interest in and to all of the Purchased Assets, free and clear of any Encumbrances except for Permitted Encumbrances.

    4.6   <u>Litigation</u>. There is no existing private or governmental action, suit, proceeding, claim, arbitration or, to Sellers' knowledge, any investigation pending before any Governmental Entity, foreign or domestic, or, to Seller's knowledge, threatened against Sellers or any of their properties or any of its officers or directors (in their capacities as such) that relate to the Products or any of the Purchased Assets. There is no judgment, decree or order against Sellers or, to Seller's knowledge, any of their respective directors or officers (in their capacities as such), that could prevent, enjoin, or materially alter or delay any of the transactions contemplated by this

Agreement, or that could reasonably be expected to have a material adverse effect on the Products or Purchaser's use and operation of the Purchased Assets on the same basis as used and operated by Sellers prior to the Closing. All litigation to which Sellers are a party (or, to the knowledge of Sellers, threatened to become a party) related to the Products or the Purchased Assets is described in <u>Schedule 4.6</u>.

      4.7    <u>Inventory</u>. The Inventory (a) will be of good quality, (b) is usable and saleable in the ordinary course and merchantable and fit for the purpose for which it was procured or manufactured, (c) meets applicable manufacturing specifications, requirements of applicable law, and Sellers' customers' policies on shelf life and "sell by dates," and is suitable for use, and (d) will not be spoiled, damaged or contaminated.

      4.8    <u>Intellectual Property</u>.

      (a)    Sellers own and have good and marketable title to all Assigned Intellectual Property. The Assigned Intellectual Property collectively constitutes all of the Intellectual Property necessary (a) to enable Sellers to manufacture, market, sell and license the current Products, and (b) for Purchaser to conduct the Business in the same manner as it was conducted by Sellers as of immediately prior to the Closing, including the manufacturing, packaging and distribution of the Products.

      (b)    <u>Schedule 4.8(b)</u> contains a complete list and brief description of the following with respect to each item of Assigned Intellectual Property:

      (i)    any of the following owned by Sellers: all issued patents and patent applications, all Assigned Trademarks, all registered Copyrights and all pending Copyright registrations, including the jurisdictions in which each such item of Intellectual Property has been issued or registered or in which any such application for such issuance and registration has been filed;

      (ii)    all agreements under which Sellers have granted to any third party any license or other right to any Assigned Intellectual Property, including any rights to resell, distribute or sublicense a Product or any agreements to manufacture Products, indicating whether such arrangement is exclusive or non-exclusive; and

      (iii)    all licenses of Intellectual Property from any third party (excluding off-the-shelf software licenses).

      (c)    Except as set forth in <u>Schedule 4.8(c)</u>, to Sellers' knowledge, there is no unauthorized use, disclosure, infringement or misappropriation of any Assigned Intellectual Property, including any Intellectual Property of a third party that is Assigned Intellectual Property, by any third party, including any employee or former employee of Sellers. Sellers have not brought a proceeding alleging infringement of Assigned Intellectual Property or breach of any license or agreement involving Assigned Intellectual Property against any third party. Except as set forth in <u>Schedule 4.8(c)</u>, there is no proceeding pending nor to Sellers' knowledge threatened, nor has any claim or demand been made alleging Sellers' infringement of Intellectual Property of a third party as it relates to the Assigned Intellectual Property or the Products or

Sellers' breach of any license or agreement involving Intellectual Property of a third party as it relates to the Assigned Intellectual Property or the Products.

(d)     Sellers have not entered into any agreement to indemnify any other person against any charge of infringement of any Assigned Intellectual Property.

(e)     There are no royalties, fees or other payments payable by Sellers to any Person by reason of the ownership, use, sale or disposition of any Assigned Intellectual Property.

(f)     Sellers are not in breach of any material term of any license, sublicense, agreement to manufacture or other agreement relating to the Assigned Intellectual Property. Neither the execution, delivery or performance of this Agreement or any Ancillary Documents nor the consummation of the transactions contemplated by this Agreement will contravene, conflict with or result in any limitation on the Purchaser's right to own or use any Assigned Intellectual Property.

(g)     To Sellers' knowledge, all registered Assigned Trademarks and registered Copyrights relating to the Assigned Intellectual Property and the Products, and all patents owned by Sellers relating thereto, are valid and subsisting. All maintenance and annual fees currently due have been fully paid and all fees paid during prosecution and after issuance of any patent comprising or relating to the Assigned Intellectual Property and the Products have been paid on time in the correct entity status amounts. Except as set forth in Schedule 4.8(g), there is no proceeding pending nor, to Sellers' knowledge, threatened, nor has any claim or demand been made, that challenges the legality, validity, enforceability or ownership of any item of Assigned Intellectual Property.

(h)     Except as set forth in Schedule 4.8(h), Sellers are not infringing, misappropriating or making unlawful use of any Intellectual Property owned by any third party as it relates to the Products. Except as set forth in Schedule 4.8(h), Sellers have not received any written notice of any actual, alleged, possible or potential infringement, misappropriation or unlawful use by Sellers of any Intellectual Property owned by any third party as it relates to the Products, nor is there any proceeding pending or, to Sellers' knowledge threatened, that alleges a claim of infringement by Sellers of any Intellectual Property of any third party as it relates to the Products.

(i)     No current or former officer, director, stockholder, employee, consultant or independent contractor has any right, claim or interest in or with respect to any Assigned Intellectual Property.

(j)     Sellers have taken commercially reasonable and customary measures and precautions to protect and maintain the confidentiality of all Assigned Intellectual Property (except such Assigned Intellectual Property whose value would be unimpaired by public disclosure) and otherwise to maintain and protect the full value of all Assigned Intellectual Property. Except as set forth in Schedule 4.8(j), all disclosure or, to Sellers' knowledge, use or appropriation of Assigned Intellectual Property not otherwise protected by patents, patent applications or copyright ("Confidential Information") owned by Sellers to a third party has been pursuant to the terms of a written agreement between Sellers and such third party.

PA\10485202.7
320629-8                                              14

(k)     A complete list of each of the Products, together with a brief description of each, is set forth in Schedule 1.37.

(l)     Sellers are not subject to any proceeding or outstanding decree, order, judgment or stipulation restricting in any manner the use, transfer or licensing of any Assigned Intellectual Property by Sellers, or which may affect the validity, use or enforceability of such Assigned Intellectual Property. Sellers are not subject to any agreement that restricts in any material respect the use, transfer, delivery or licensing by Sellers of the Assigned Intellectual Property or Products, except for agreements relating to third party Intellectual Property and exclusive license agreements with respect to Assigned Intellectual Property.

4.9     Financial Information. Sellers have provided unaudited financial statements for the Foodservice Business for the fiscal year ended August 31, 2006 (the "Financial Statements"). The Financial Statements have been prepared on a consistent basis throughout the periods indicated. The Financial Statements fairly present the financial condition and operating results of the Foodservice Business as of the dates, and for the periods, indicated therein, subject to normal year-end audit adjustments and the addition of notes.

4.10     Accounts Receivable. The Accounts Receivable are valid and genuine, have arisen solely out of bona fide sales and deliveries of Products and other business transactions in the ordinary course of business consistent with past practices in each case with persons other than Affiliates, are not subject to any prior assignment, lien or security interest, and are not subject to valid defenses, set-offs or counter claims. The Accounts Receivable are collectible in accordance with their terms at their recorded amounts.

4.11     Compliance with Laws and Regulations; Governmental Licenses, Etc.

(a)     Each Seller is in compliance in all material respects with all statutes, laws, rules and regulations with respect to or affecting the Products or the Purchased Assets and which could reasonably be expected to affect Purchaser's manufacturing, packaging and distribution of the Products or Purchaser's use and enjoyment of the Purchased Assets from and after the Closing, including, without limitation, laws, rules and regulations of the U.S. Food and Drug Administration and those relating to anticompetitive or unfair pricing or trade practices, false advertising and consumer protection. Neither Seller is subject to any order, injunction or decree issued by any Governmental Entity which could impair the ability of Sellers to consummate the transactions contemplated hereby or which could adversely affect Purchaser's manufacturing, packaging and distribution of the Products or Purchaser's use and enjoyment of the Purchased Assets from and after the Closing.

(b)     Schedule 4.11 contains a list of all material Permits required from Governmental Entities in order to permit Sellers to own and operate the Purchased Assets and to manufacture, package and distribute the Products. All of such Permits, approvals and authorizations are currently valid and in full force and effect and Sellers are operating in material compliance therewith. To the extent transferable under applicable law, all such Permits will be available and assigned to Purchaser at the Closing.

4.12    <u>Warranty and Other Claims</u>. All of the Products manufactured, sold and delivered by Sellers prior to the Closing have conformed in all material respects with all applicable contractual commitments and all express and implied warranties, and Sellers have no material liability (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due) for replacement or repair thereof or other damages in connection therewith. Sellers have no liability (and, to Sellers' knowledge, there is no reasonably meritorious basis for, or threat of, any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand against Sellers reasonably expected to give rise to any liability) arising out of any injury to individuals or property as a result of the ownership, possession or use of any Product manufactured, sold or delivered by Sellers or any subsidiary or other Affiliate of Sellers prior to the Closing Date.

4.13    <u>Contracts</u>.

(a)    <u>Schedule 2.2(d)</u> contains a complete and accurate list of all Assigned Contracts. Sellers have delivered to Purchaser current and complete copies of the documents constituting all Assigned Contracts (or, in the case of oral contracts, accurate descriptions thereof). Except for such Assigned Contracts, there are no contracts or agreements (written or verbal) (a) exclusively relating to the Purchased Assets; or (b) relating to the Purchased Assets involving the manufacturing, packaging or distribution of the Products, except marketing and advertising services and agreements with suppliers for commodities. Except as otherwise specified on <u>Schedule 4.13(a)</u>, each written Assigned Contract is a valid and binding obligation of Integrated Brands or Eskimo Pie, as the case may be, and, to Sellers' knowledge, of each other party thereto in accordance with its respective terms, subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. Each Seller or one of their respective Affiliates, has performed all material obligations required to be performed by it to date under the Assigned Contracts, and neither Sellers nor any of their respective Affiliates, nor, to Sellers' knowledge, any other party to such Assigned Contracts, is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder.

(b)    There are no material unresolved claims or disputes between Sellers and any of the principal vendors or suppliers of the Business, and none of such persons has advised Sellers of its intention to cease doing business with Sellers, or with Purchaser following the Closing Date, whether as a result of the transactions contemplated hereunder or otherwise.

(c)    Each accepted and unfilled order entered into by Sellers for the sale, license or lease or other disposition by Sellers of Products was made in the ordinary course of business.

4.14    <u>Customers and Distributors</u>. <u>Schedule 4.14</u> contains a complete and accurate list of the twenty (20) largest Customers of the Products for the Foodservice Business and the Frozen Novelty Business during the fiscal year ended August 31, 2006, showing, with respect to each, the name and address and dollar volume involved and Products by SKU bought or sold (collectively, the "<u>Major Customers</u>"). <u>Schedule 4.14</u> shall also contain the name and address of the distributors for the Products (the "<u>Distributors</u>"), locations and the associated dollar volumes

for Products sold to each Distributor. To Sellers' knowledge, no Major Customer or Distributor has any plan or intention to terminate, cancel or otherwise materially and adversely modify its relationship with Sellers or to decrease materially or limit its services to Sellers or its usage, purchase or distribution of the Products, in each case to the extent related to the Purchased Assets and the Products. Sellers are not engaged in any material dispute with any Major Customer or Distributor with respect to the Purchased Assets or the Products.

4.15    Absence of Liabilities. Sellers do not have any liabilities of any nature (matured or unmatured, fixed or contingent) with respect to which Purchaser will become liable hereunder, except for the Assumed Liabilities and those liabilities for which Purchaser agrees to be responsible under the Co-Pack Agreement.

4.16    Insurance. Each Seller has fire, casualty and other insurance policies, with extended coverage, sufficient in amount to allow it to replace any of the Purchased Assets which might be damaged or destroyed or sufficient to cover liabilities to which such Seller may reasonably become subject, on both a per-occurrence and an aggregate basis, consistent with industry practice. There is no default or event that could give rise to a default under any such policy.

4.17    Brokers. There is no broker or other person who would have any valid claim against Purchaser for a finder's fee or broker's fee or commission in connection with this Agreement or the transactions contemplated hereby as a result of any agreement, understanding or action by or on behalf of Sellers or any of their Affiliates. Sellers shall be solely responsible for all fees and expenses of any broker, finder or other person engaged by or on behalf of them or their Affiliates or otherwise claiming through them in connection with the transactions contemplated by this Agreement.

4.18    Accuracy of Material Facts; Copies of Materials. No representation, warranty or covenant of Sellers contained in this Agreement or in any Ancillary Document contains or shall contain any untrue statement of a material fact or omits to state material facts necessary in order to make the statements contained therein not misleading. Sellers have delivered to Purchaser true and complete copies of each contract, agreement, license, lease and similar document (or, if oral summaries of same) referred to in any Schedule hereto or included in the Purchased Assets.

4.19    Solvency. Each Seller is and, immediately after giving effect to the transactions contemplated hereby will be, Solvent.

4.20    No Other Representations and Warranties. Except for the representations and warranties contained in this Article IV, neither Integrated Brands nor Eskimo Pie nor any of their respective agents, Affiliates or representatives, nor any other person, makes or shall be deemed to make any representation or warranty to Purchaser, expressed or implied, at law or in equity, on behalf of Sellers, and Sellers hereby disclaim any such representation or warranty whether by Sellers or any of their respective officers, directors, employees, agents or representatives or any other person, with respect to the execution and delivery of this Agreement or the transactions contemplated hereby, notwithstanding the delivery or disclosure to Purchaser or any of its respective officers, directors, employees, agents or representatives or any other person of any documentation or other information by Sellers or any of their respective officers, directors,

employees, agents or representatives or any other person with respect to any one or more of the foregoing; provided, however, that the limitations set forth in this Section 4.20 shall not affect any representations or warranty expressly made in any Ancillary Documents.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF PURCHASER

5.1   Organization.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite corporate power to own, lease and operate its properties and to conduct its business as it is currently being conducted.  Purchaser is duly qualified or licensed to do business as a foreign corporation in each jurisdiction in which failure to be so qualified or licensed would have a material adverse effect on Purchaser.

5.2   Authorization.  This Agreement and all of the Ancillary Documents to which Purchaser is or will be a party have been, or upon their execution and delivery hereunder will have been, duly and validly executed and delivered by Purchaser and constitute, or will constitute, valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their respective terms.  Purchaser has the requisite corporate power and authority to execute and deliver this Agreement and the Ancillary Documents to which Purchaser is or will be a party and, at the time of the Closing, will have the requisite corporate power and authority to carry out the transactions contemplated by this Agreement and the Ancillary Documents.  The execution, delivery and performance by Purchaser of the Agreement and the Ancillary Documents have been duly and validly approved and authorized by Purchaser's Board of Directors.  No approval of Purchaser's stockholders is required to effect the transactions contemplated by this Agreement or the Ancillary Documents.

5.3   No Conflicts; Consents.  The execution and delivery by Purchaser of this Agreement and the Ancillary Documents to which Purchaser is or will be a party do not, and the consummation of the transactions contemplated hereby and compliance by Purchaser with the provisions hereof and thereof will not, contravene, conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under or violation of, or result in the creation of any charge or Encumbrance pursuant to, (i) any provision of the Certificate of Incorporation or Bylaws of Purchaser, (ii) any judgment, order, decree, rule, law or regulation of any court or Governmental Entity applicable to Purchaser, or (iii) any provision of any agreement, instrument or understanding to which Purchaser is a party or by which Purchaser is bound.  No consent, approval, order or authorization of, or registration, declaration or filing with, any third party or any Governmental Entity is required to be obtained on the part of Purchaser to permit the consummation of the transactions contemplated by this Agreement or the Ancillary Documents, except for such consents, authorizations, filings, approvals and registrations which, if not obtained or made, would not prevent or materially alter or delay any of the transactions contemplated by this Agreement or be reasonably likely to have a material adverse effect on Purchaser.

5.4   Accuracy of Material Facts.  No representation, warranty or covenant of Purchaser contained in this Agreement, the Ancillary Documents or in any written statement

delivered pursuant hereto or in materials delivered to Sellers in connection with the transactions contemplated hereby contains or shall contain any untrue statement of a material fact or omits to state material facts necessary in order to make the statements contained therein not misleading.

     5.5    Brokers. There is no broker or other person who would have any valid claim against Sellers for a finder's fee or broker's fee or commission in connection with this Agreement or the transactions contemplated hereby as a result of any agreement, understanding or action by or on behalf of Purchaser or any of its Affiliates. Purchaser shall be solely responsible for all fees and expenses of any broker, finder or other person engaged by or on behalf of it or its Affiliates or otherwise claiming through it in connection with the transactions contemplated by this Agreement.

     5.6    Solvency. Purchaser is, and immediately after giving effect to the transactions contemplated hereby will be, Solvent.

## ARTICLE VI

## COVENANTS OF SELLERS

     6.1    Regulatory Approvals. Sellers will execute and file, or join in the execution and filing, of any application or other document that may be necessary in order to obtain the authorization, approval or consent of any Governmental Entity that may be reasonably required, or that Purchaser may reasonably request, in connection with the consummation of the transactions contemplated by this Agreement. Seller will use commercially reasonable efforts to obtain all such authorizations, approvals and consents.

     6.2    Consent of Third Parties. Sellers shall use commercially reasonable efforts to obtain the consent in writing of all third persons, if any, necessary to permit Sellers to assign and transfer all of the Purchased Assets (including, but not limited to, the Assigned Contracts) to Purchaser, free and clear of all Emcumbrances, including without limitation those consents listed on Schedule 4.4 hereto.

     6.3    Discharge of Excluded Liabilities. Sellers shall pay, perform and discharge, according to their terms, and indemnify and hold Purchaser and its Affiliates harmless from the Excluded Liabilities.

     6.4    Bulk Sales. Purchaser hereby waives compliance with applicable bulk transfer or similar laws, if any, and Sellers hereby jointly and severally indemnify and hold harmless Purchaser from any liabilities and obligations arising from claims made by third persons under applicable bulk sales or similar laws, if any, applicable to the transactions contemplated in this Agreement.

## ARTICLE VII

## COVENANTS OF PURCHASER

     7.1    Regulatory Approvals. Purchaser will execute and file, or join in the execution and filing, of any application or other document that may be necessary in order to obtain the

authorization, approval or consent of any Governmental Entity that may be reasonably required, or that Sellers may reasonably request, in connection with the consummation of the transactions contemplated by this Agreement. Purchaser will use commercially reasonable efforts to obtain all such authorizations, approvals and consents.

7.2     Consent of Third Parties. Purchaser will use commercially reasonable efforts to obtain the required written consents and authorizations of all third persons and to make all filings with, and give all notices to, third persons which may be necessary or reasonably required on its part in order to effect the transactions contemplated hereby.

7.3     Discharge of Assumed Liabilities. Subject to and upon the terms and conditions of this Agreement, Purchaser shall pay, perform and discharge, according to their terms, the Assumed Liabilities.

ARTICLE VIII

MUTUAL COVENANTS

8.1     Confidentiality.

(a)     Purchaser acknowledges that all information provided to it by Sellers or their respective Affiliates, agents and representatives is subject to the terms of the Confidentiality Agreement, the terms of which are incorporated by reference herein. Effective upon, and only upon, the Closing, the Confidentiality Agreement will terminate only with respect to information provided to Purchaser and/or its Affiliates that relates to the Products or is included in or is related to the Purchased Assets and the Assumed Liabilities (the "Excluded Information"); and Purchaser acknowledges that any and all information provided to it by either Seller or their respective Affiliates, agents and representatives (other than the Excluded Information) shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

(b)     Each Seller acknowledges that all information provided to it by Purchaser or its Affiliates, agents and representatives (the "Purchaser Confidential Information") shall be subject to the terms of the Confidentiality Agreement, the terms of which are incorporated herein by reference, to the same extent as if the Purchaser Confidential Information were "Confidential Information" as such term is defined in the Confidentiality Agreement. In accordance with the Confidentiality Agreement, each Seller shall keep secret and retain in strictest confidence, and shall not use for the benefit of itself or others, all information relating to the Products or included in or exclusively related to the Purchased Assets and the Assumed Liabilities, including Formulations, Specifications, know-how, trade secrets, customer lists, details of customer or supplier contracts, pricing policies, marketing plans or strategies, product development plans, inventions and research projects relating to the Products, the Purchased Assets and the Assumed Liabilities and shall not disclose such information to anyone other than Purchaser except as required by law, for Tax purposes or with Purchaser's express written consent.

8.2     Publicity. Except as may otherwise be required by applicable law, rule or regulation of any Governmental Entity or other entity having authority over a party or the

transactions contemplated hereby, neither party shall make or cause to be made any public announcements in respect of this Agreement or the transactions contemplated herein or otherwise communicate with any news media without the prior written consent of the other party. On and prior to the Closing Date, Purchaser and Sellers shall advise and confer with each other prior to the issuance of any reports, statements or releases concerning this Agreement (including the exhibits hereto) and the transactions contemplated herein. Neither Purchaser nor Sellers will make any public disclosure prior to the Closing or with respect to the Closing unless both parties agree on the text and timing of such public disclosure, except as required by applicable law, rule or regulation of any Governmental Entity or other entity having authority over a party or the transactions contemplated hereby. Nothing contained in this Section shall prevent any party at any time from furnishing any information pursuant to the requirements of any Governmental Entity.

8.3     Books and Records. If, in order properly to prepare documents required to be filed with Governmental Entities (including Tax authorities) or its financial statements, it is reasonably necessary that any party hereto or any successors be furnished with additional information relating to the Purchased Assets, the Assumed Liabilities or the Business, and such information is in the possession of any other party hereto, such party agrees to use commercially reasonable efforts to promptly furnish such information to the party needing such information, at the cost and expense of the party being furnished such information, provided that neither party shall be obligated to furnish information if such disclosure would, in the reasonable judgment of legal counsel to such party, constitute a waiver of the attorney-client privilege. From and after the date of this Agreement and continuing beyond the Closing, Sellers shall cooperate with Purchaser and provide to Purchaser at Purchaser's expense all financial information that may be reasonably required to enable Purchaser to comply with all applicable laws, rules and regulations, and any governmental filing requirements, with respect to reporting and reflecting the transactions contemplated by this Agreement.

## ARTICLE IX

## CLOSING DELIVERABLES

9.1     Closing Deliverables of Purchaser. On the Closing Date, unless waived in writing by Sellers, Purchaser shall deliver to Sellers:

(a)     A certificate, dated the Closing Date and signed by the President or a Vice President of Purchaser, stating that all of the representations and warranties of Purchaser set forth in Article V hereof shall be true on and as of the Closing Date, except to the extent that the failure of any such representation or warranty to be true and correct on and as of the Closing Date, individually or in the aggregate, would not be reasonably likely to have a material adverse effect on Purchaser, or a material adverse effect upon the consummation of the transactions contemplated hereby.

(b)     A certificate, dated the Closing Date and signed by the President or a Vice President of Purchaser, stating that all of the terms, covenants and conditions of this Agreement to be complied with and performed by Purchaser at or prior to the Closing shall have been duly complied with and performed in all material respects.

(c)    Certificates of the Secretary or an Assistant Secretary of the Purchaser, dated the Closing Date, (A) as to the incumbency and signatures of the officers of the Purchaser executing this Agreement and the Ancillary Documents, and (B) certifying attached resolutions of the Board of Directors of the Purchaser that authorize the execution, delivery and performance of this Agreement and the Ancillary Documents.

(d)    A good standing certificate, dated no more than two (2) Business Days prior to the Closing, of Purchaser.

(e)    An opinion of Purchaser's general counsel, in the form attached hereto as Exhibit C.

(f)    An assignment and assumption of obligations agreement.

(g)    The Co-Pack Agreement signed by Purchaser.

(h)    The Escrow Agreement signed by Purchaser.

9.2    <u>Closing Deliverables of Sellers</u>.  On the Closing Date, unless waived in writing by Purchaser, each Seller shall deliver to Purchaser:

(a)    A certificate, dated the Closing Date and signed by the CEO, President or a Vice President of such Seller, stating that all the representations and warranties of Sellers set forth in Article IV hereof shall be true on and as of the Closing Date, except to the extent that the failure of any such representation or warranty to be true and correct on and as of the Closing Date, individually or in the aggregate, would not be reasonably likely to have a material adverse effect on the Business or the Purchased Assets, or a material adverse effect upon the consummation of the transactions contemplated hereby.

(b)    A certificate, dated the Closing Date and signed by the CEO, President or a Vice President of such Seller, stating that all of the terms, covenants and conditions of this Agreement to be complied with and performed by Sellers at or prior to the Closing shall have been duly complied with and performed in all material respects.

(c)    Certificates of the Secretary or an Assistant Secretary of such Seller, dated the Closing Date, (A) as to the incumbency and signatures of the officers of such Seller executing this Agreement and the Ancillary Documents, and (B) certifying attached resolutions of the Board of Directors of such Seller that authorize the execution, delivery and performance of this Agreement and the Ancillary Documents.

(d)    A good standing certificate, dated no more than two (2) Business Days prior to the Closing, of such Seller.

(e)    Any and all required consents from third parties to the instruments required to allow the consummation of the sale of the Purchased Assets and the other transactions contemplated hereby.

(f)     An opinion of counsel to the Sellers, in the form attached hereto as Exhibit D.

(g)     A bill of sale for the Purchased Assets.

(h)     An assignment and assumption of obligations agreement.

(i)     The Co-Pack Agreement signed by Integrated Brands, Inc. and Sugar Creek Foods, Inc.

(j)     The Escrow Agreement signed by each Seller.

## ARTICLE X

## POST-CLOSING MATTERS

10.1    <u>Accounts Receivable</u>.  To the extent either Seller receives any payment after the Closing from a Customer on account of an Account Receivable, such Seller shall hold such payment in trust for the benefit of Purchaser and promptly remit such funds to Purchaser.

10.2    <u>Further Assurances of Sellers</u>.

(a)     Sellers shall, from time to time, at the reasonable request of Purchaser, and without further consideration, execute and deliver such instruments of transfer, conveyance and assignment in addition to those delivered pursuant to Section 3.2 hereof, and take such other actions, as may be reasonably necessary to assign, transfer, convey and vest in Purchaser, and to put Purchaser in possession of, the Purchased Assets.  In the event that any subsidiary or Affiliate of Sellers own or hold rights to any of the Purchased Assets, Sellers covenant and agree to cause each such subsidiary or Affiliate to take whatever action and execute whatever documents as are necessary to implement this Agreement and the Ancillary Documents.  From and after the date of the Closing, Sellers agree to convey, transfer, and assign to Purchaser, free and clear of all Encumbrances, any tangible or intangible rights, properties or assets relating to the Purchased Assets then held by Sellers, the conveyance, transfer or assignment of which would have been necessary for the representations and warranties of Sellers herein to be true and correct as of the date of the Closing, or the conveyance, transfer or assignment of which was or is required by the covenants of Sellers contained in this Agreement.  Purchaser will be allowed to visually inspect and verify and confirm the condition of the Purchased Assets before crating in accordance with generally accepted standards.

(b)     If, after the Closing Date, in order properly to utilize the Purchased Assets, or prepare documents or reports required to be filed with the governmental entities or prepare Purchaser's financial statements related to the Business or the Purchased Assets, it is reasonably necessary that Purchaser obtain additional information within Sellers' possession relating to the Business or the Purchased Assets, Sellers shall furnish or cause their respective representatives to furnish such information to Purchaser as promptly as possible.  Sellers agree to maintain any and all information and records regarding the Business and its operations necessary to permit Purchaser to calculate the availability to it of Tax credits for increasing research activities under

Section 41 of the Code. Seller shall maintain and make available the information and records specified in this Section for a period of three (3) years after the Closing Date.

(c)  After the Closing Date, at Purchaser's reasonable request Sellers will assist Purchaser in the determination of the legitimacy of any product return and warranty claim with respect to Products.

10.3  Further Assurances of Purchaser. Purchaser shall, from time to time at the reasonable request of Sellers, and without further consideration, execute and deliver such instruments of assumption, and take such other action, as may be reasonably necessary to effectively confirm the assumption by Purchaser of the Assumed Liabilities. After the Closing Date, Purchaser will handle all product returns and warranty returns for the Products. All product returns and warranty returns for Products shipped by Sellers prior to the Closing Date shall be an item for which Purchaser may seek indemnification from Sellers pursuant to the provisions of Article XI of this Agreement.

10.4  Use of Intellectual Property.

(a)  Immediately after the Closing, Purchaser and/or its designated Affiliates shall grant to Sellers and/or their Affiliates a fully paid-up non-transferable and non-exclusive license to use the "Real Fruit" Trademark (the "Real Fruit Trademark") solely on those frozen novelty products packaged, marketed and sold by Sellers and/or their Affiliates as of the date hereof, which are listed on Schedule 10.4 attached hereto, during the twelve-month period following the Closing Date. Sellers agree not to alter or modify the Real Fruit Trademark in any manner without the prior written consent of Purchaser and/or its designated Affiliates. Notwithstanding the foregoing, Purchaser and/or its designated Affiliates shall not, as a result of such license, be liable for any obligations, liabilities or commitments in respect of any products sold or shipped by Sellers bearing the Real Fruit Trademark licensed hereunder at any time after the Closing Date.

(b)  Sellers recognize that, after the Closing, Purchaser and/or its designated Affiliates is the rightful owner of the Real Fruit Trademark and acknowledge that all goodwill and other rights in the Real Fruit Trademark shall at all times vest absolutely in Purchaser and/or its designated Affiliates. Sellers shall not challenge or dispute (except for disputes confirming Purchaser's ownership of or right to the Assigned Intellectual Property as of and after the Closing Date) nor assist any third party in challenging or disputing the ownership by Purchaser and/or its designated Affiliates of the Real Fruit Trademark after the Closing Date. Except as expressly contemplated in this Section 10.4, in no event shall Sellers or their Affiliates have any right to use Assigned Intellectual Property related to the "Real Fruit" Trademark or name.

(c)  The license for the use of the Real Fruit Trademark is for the benefit of Sellers and/or their Affiliates only. Neither Seller shall sub-license the use of the Real Fruit Trademark licensed hereunder to any third party. Any sub-license in violation of this Section 10.4 shall be of no effect and shall constitute a material breach of this Agreement by Sellers.

(d)     Each Seller shall use the same level of care and shall provide the same protections to the Real Fruit Trademark licensed hereunder, in their use thereof in accordance with this Section 10.4, as used and provided by such Seller with respect to such Seller's own Trademarks.

10.5     <u>Sale of Retained Inventory</u>.  Purchaser acknowledges that Sellers have the right to sell the existing inventory of finished-goods Products (but not manufacture additional Products) that is not purchased by Purchaser pursuant to this Agreement.

ARTICLE XI

<u>SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION</u>

11.1     <u>Survival of Representations and Warranties</u>.  The representations and warranties set forth in this Agreement shall survive the Closing for a period of twelve (12) months after the Closing Date (at which time they shall terminate).  After the expiration of such twelve (12) month period, such representations and warranties shall expire and be of no further force and effect unless a claim or claims with respect thereto shall have been asserted under this Article XI prior to the expiration of such period.

11.2     <u>Indemnification by Sellers</u>.

(a)     Subject to the terms and conditions of this Article XI, Sellers agree, jointly and severally, to indemnify, defend and hold harmless Purchaser, its stockholders, officers, directors, employees and attorneys, all subsidiaries and Affiliates of Purchaser, and the respective officers, directors, employees and attorneys of such entities (all such persons and entities being collectively referred to as the "<u>Purchaser Group</u>") from, against, for and in respect of any and all Losses asserted against, relating to, imposed upon or incurred by Purchaser and/or any other member of the Purchaser Group by reason of, resulting from, based upon or arising out of any of the following (collectively, "<u>Purchaser Indemnifiable Losses</u>"):

(i)     the breach, inaccuracy, untruth or incompleteness of any representation or warranty of Sellers contained in or made pursuant to this Agreement or any certificate or Schedule delivered by Sellers in connection herewith;

(ii)     the breach or violation of any covenant or agreement of Sellers contained in or made pursuant to this Agreement;

(iii)     any of the Excluded Liabilities;

(iv)     Sellers' share of any Transfer Taxes;

(v)     any Encumbrance (other than Permitted Encumbrances) on the Purchased Assets existing at the Closing or arising as a result of the transactions contemplated by this Agreement;

(vi)     the failure of Sellers to deliver the Purchased Assets to Purchaser; or

(vii)     any breach by Sellers of this Article XI.

(b)     Sellers shall not be required to indemnify Purchaser and/or any other member of the Purchaser Group for any Purchaser Indemnifiable Losses unless and only to the extent that the aggregate amount of all Purchaser Indemnifiable Losses for which one or more of the Purchaser Group seeks indemnification hereunder exceeds $75,000 (the "Purchaser Basket"), in which event Sellers shall be liable to indemnify the Purchaser Group for all Purchaser Indemnifiable Losses, excluding Purchaser Indemnifiable Losses within the Purchaser Basket; provided, however, that the UPC codes are sold "as is" and the freezers included in the Tangible Assets that are not subject to Accounts Payable assumed by Purchaser are sold "as is" (if located) and are not subject to Sellers' indemnification obligations if they cannot be located. Notwithstanding anything to the contrary herein, Seller's obligation under this Article XI for Purchaser Indemnifiable Losses for any failure to deliver the Assigned Intellectual Property and the Inventory free and clear of any Encumbrance (other than Permitted Encumbrances) shall not be subject to the Purchaser Basket and, except as set forth in Section 11.2(d), Sellers' obligation under this Article XI for Purchaser Indemnifiable Losses shall not exceed the Purchase Price.

(c)     The obligation of Sellers to indemnify members of the Purchaser Group for any Purchaser Indemnifiable Losses is subject to the condition that Sellers shall have received an Indemnification Claim for all Purchaser Indemnifiable Losses for which indemnity is sought on or before the first anniversary of the Closing Date.

(d)     The provisions of Sections 11.2(b) and (c) above shall not limit, in any manner, Sellers' obligation to indemnify members of the Purchaser Group for Purchaser Indemnifiable Losses arising from (i) fraud, willful misconduct or intentional misrepresentation on the part of Sellers, or (ii) Sellers' failure to perform and discharge all Excluded Liabilities and pay any amounts contemplated by Sections 2.6 and 12.6.

(e)     Sellers shall not be liable for damages in excess of the actual damages suffered by a member of the Purchaser Group as a result of the act, circumstance or condition for which indemnification is sought, net of any insurance proceeds received by the Purchaser Group.

11.3     Escrow Fund.

(a)     At the Closing, the Escrow Funds shall be deposited with U.S. Bank, National Association (or such other institution selected by Purchaser with the reasonable consent of Sellers) as escrow agent (the "Escrow Agent"), such deposit and any interest or earnings thereon to constitute the escrow fund to be governed by the terms set forth herein and in the Escrow Agreement attached hereto as Exhibit B.  The Escrow Funds shall be available to compensate Purchaser pursuant to the indemnification obligations of the Sellers set forth in this Article XI.  Purchaser shall pay all fees and expenses of the Escrow Agent.

(b)     Except as set forth in Section 11.2(d) above, claims against the Escrow Funds shall be Purchaser's sole and exclusive remedy against Sellers for any Indemnifiable Losses under this Article XI; provided, however, that nothing contained in this Article XI shall limit in any manner, any remedy at law or in equity to which Purchaser or any other member of

the Purchaser Group shall be entitled against Sellers as a result of fraud, willful misconduct or intentional misrepresentation by Sellers, or any of their representatives or agents.

(c)    The escrow established pursuant to the Escrow Agreement shall terminate twelve (12) months after the Closing Date (the "Termination Date"); provided, however, that a portion of the Escrow Funds, which, in the reasonable judgment of the Purchaser, subject to the objection of Sellers and the subsequent resolution of the matter in the manner provided in the Escrow Agreement, is necessary to satisfy any unsatisfied claims specified in any Officer's Certificate theretofore delivered to the Escrow Agent prior to the Termination Date with respect to the facts and circumstances existing prior to the Termination Date, shall remain in the escrow until such claims have been resolved.

11.4    Indemnification by Purchaser.

(a)    Subject to the terms and conditions of this Article XI, Purchaser agrees to indemnify, defend and hold harmless each Sellers, their respective stockholders, officers, directors, employees and attorneys, all subsidiaries and Affiliates of Sellers, and their respective officers, directors, employees and attorneys of such entities (all such Persons and entities being collectively referred to as the "Seller Group") from, against, for and in respect of any and all Losses asserted against, relating to, imposed upon or incurred by each Seller and/or any other member of the Seller Group by reason of, resulting from, based upon or arising out of any of the following (collectively, "Seller Indemnifiable Losses"):

(i)    the breach, inaccuracy, untruth or incompleteness of any representation or warranty of Purchaser contained in or made pursuant to this Agreement or any certificate or schedule delivered by Purchaser in connection herewith;

(ii)    the breach or violation of any covenant or agreement of Purchaser contained in or made pursuant to this Agreement;

(iii)    any of the Assumed Liabilities on and after the Closing Date;

(iv)    Purchaser's share of any Transfer Taxes; or

(v)    any breach by Purchaser of this Article XI.

(b)    Purchaser shall not be required to indemnify Sellers and/or any other member of the Seller Group for any Seller Indemnifiable Losses unless and only to the extent that the aggregate amount of all Seller Indemnifiable Losses for which one or more of the Seller Group seeks indemnification hereunder exceeds $75,000 (the "Seller Basket"), in which event Purchaser shall be liable to indemnify the Seller Group for all Seller Indemnifiable Losses, excluding Seller Indemnifiable Losses within the Seller Basket. Notwithstanding anything to the contrary herein, except as set forth in Section 11.4(d), Purchaser's obligation under this Article XI for Seller Indemnifiable Losses shall not exceed the Purchase Price.

(c)    The obligation of Purchaser to indemnify members of the Seller Group for any Seller Indemnifiable Losses is subject to the condition that Purchaser shall have received an